UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal Action 20-cr-10197-LTS |
| ) | |
| ) | |
| DARIUS BASS ) | |
| Defendant ) | |

MEMORANDUM IN SUPPORT OF
MOTION TO SUPPRESS EVIDENCE
(SEARCH WARRANT)

**Facts**

Three search warrants were written on May 11, 2020 for 20 Humphreys Street, Apt. 3 in Dorchester. Two were written in state court, one of which was not executed, and one was written in federal court that also appears not to be executed. See 2002SW0070; 2002SW0067 and 20-mj-6326-MPK.

Notable of the state warrant 2002SW0067, which was not executed, was the lack of authorization to enter the premises without announcement and search any person present.

Both state warrants were written by the same affiant, to wit: Det. Wightman of the Boston Police Department (BPD); both appear to contain the same information and numbered paragraphs; both requested no knock entry. Both were signed by Clerk Magistrate Kevin Lyler. Without apparent changes in the affidavit, search warrant 2002SW0070 allowed no knock entry and searching of any person present. It is unknown what additional information, if any, caused a change in probable cause to allow no knock entry.

The BPD conducted the search on May 12, 2020 at 6:23 am. The SWAT team entered and handcuffed Deborah Hendrix, the mother of Darius Bass, who was found in a bedroom. She was

1

uncuffed after a protective sweep was conducted. The officers who entered included Sgt. Det. Byrne; Sgt. Byrne; Sgt. Mason; Det. Wightman, Walsh and Gero; PO Butler; Conley Benazzani, Muhammed, Kennedy, Degrave, Ramos, Layden, Stevens, Paridis, Dan Campbell.[1]

The BPD used a battering ram to enter the front door to the apartment.  While the police were already inside, the BPD used a battering ram to enter the rear door. Det. Walsh of the BPD took photographs.

A BPD offense/incident report was written.  It appears misinformation[2] is includetherein. The following items were taken into evidence:

1. Personal Papers/Debit Cards in the name of Darius Bass
2. Gray and black hooded sweatshirt
3. Plastic firearm holster
4. Multicolored sneakers
5. Pair of black sweatpants
6. One (1) 9mm Cartridge
7. Mass Driver's License in the name of Darius Bass
8. Black firearm "Locin"
9. Silver 'USA" Revolver
10. Assorted Ammo

A search warrant was issued by the Magistrate Judge.  See 20-mj-6326-MPK. The affiant of the federal search warrant was Det. Brian Ball, a Boston Police Officer who was federally deputized as a Task Force Officer assigned to the US Marshals Massachusetts Task Force. The warrant requested no announcement.  The warrant was issued on May 11, 2020 at 2:57 pm.  There is no evidence that it was executed.

**FACTS LEADING UP TO SEARCH**

On May 2, 2020,  Boston Police executed a search warrant for 20 Humphreys Street, Apt. 3, Dorchester,  Massachusetts. The warrant application was supported by an affidavit authored by

---

[1] The names are as listed in the BPD incident report.
[2] The report lists the following incorrect information: 152 E. Cottage St, Dorchester as offense location; occurred date May 11, 2020 06:23; occurred date of May 2, 2020; Search Warrant No, 2020SW0071.

Detective Wightman.

The first 5 paragraphs of the affidavit captioned as "The Affiant" describes the experience of the affiant.

Paragraphs 6-11 captioned as "The Investigation" includes the investigation that the affiant is involved with; the locations to be searched; the persons to be searched; that the evidence is material and relevant to an ongoing shots fired investigation on May 2, 2020 in the area of 152 East Cottage Street, Dorchester. Included in relevant part are the names of the individuals, including Darius Bass, that the affiant believes have committed unlawful possession of a firearm.

Paragraphs 12-16 entitled "Shots Fired at 152 East Cottage Street" describes the officers response to East Cottage Street at 7:00 pm on May 2, 2020; the scene as they saw it; the evidence they found and photographed; the persons they spoke to; the search of an alleyway in which the officers found a Smith & Wesson M&P 9 mm firearm; and the conversations with Brandao and Texeira who occupied the premises.

Paragraphs 17-27 entitled "Video Evidence" describe the obtaining of public and private cameras located in the area of 152 East Cottage Street; the detectives identifying individuals they believe are depicted; information concerning the NOB/Wendover Street Gang and its feud with Cameron Street Gang; the outfits the identified individuals were wearing as well as actions believed to be depicted through camera footage shown. Specifically described are the movements of Texixeira, Brandao and Bass and the officer's opinion that an object that is dropped and recovered is a firearm.

The affiant continues to describe the actions of Brandao and Carvalho-Centeio; the movement of an apparent firearm in the area of the rear fence to 1281 Massachusetts Ave.

Lastly included in the final two paragraphs is the statement "[t]he remaining

3

NOB/Wendover St. Gang" return to East Cottage Street; the return of Carvalho-Centeio and the exiting of individuals include Bass in a 2018 Toyota Camry[3] registered to Deborah Hendrix.

Paragraphs 28-33, "Subsequent Investigation" included the analysis of the Smith & Wesson firearm found; the changing of clothing of Brandao and Teixeira; the seeking of gunshot residue on the clothing worn by Brandao as he is alleged to be depicted firing back at the individual that shot at 152 East Cottage; the running of Bass among others through CJIS to find none had a license to carry; that the individuals had past arrest for unlawful possession; that they are or wer under investigation for firearm related violence and the majority of the incidents involve the ongoing feud with Cameron Street Gang; the belief that the firearm alleged to be in the possession of Bass was no a replica or BB gun; and the ELMO check of Teixeira and Carvalho-Centeio that were on GPS points. Carvalho-Centeio was alleged to e in the red Toyota Camry.

Paragraphs 34-40, "Cell Phones" describe the need to obtain cell phone information;

Paragraphs 41-42 "Clothing" describe the need to obtain clothing as depicted in stills taken from video images;

Paragraph 43-45 "Firearms, Ammunition, and Accessories" describes the affiant's training and experience that people store firearms in their homes or vehicles for long period of time; as well as ammunition and the ilk, and the affiant's belief there is probable cause to believe Brandao and Bass are currently possessing firearms.

Paragraph 46-54 "Target Locations/Vehicle" described the locations, persons, vehicles in which the search warrant is requested, included herein is 20 Humphreys Street, Apt. 3; common areas; basement; Darius Bass and the Toyota 2018 Camry.

No-Knock Entry is included in Paragraph 55 for 20 Humphrey Street, Dorchester among

---

[3] A search warrant was issued for the vehicle, See 2020SW0068, with nothing founds in the vehicle.

4

two other locations.

> 72 Farrington Street, Quincy. 20 Harlem Street, Dorchester, and 20 Humphreys Street, Dorchester, are in densely occupied residential areas and the safety of innocent civilians isa primary concern. I am requesting a "no knock" entry for these specific locations because this will allow officers quicker access to the addresses. Michael BRANDAO, Delven CARVALHO-CENTEIO, and Darius BASS have been involved with a violent street gang and have past arrests for Unlawful Possession of a Firearm and other firearm related arrests. All of these individuals have been investigated in the past, or are currently under investigation, for their suspected involvement in several incidents of firearm related violence. In addition, warrants are being sought in Roxbury District Court for the firearm offenses including Possession of and Illegal Firearm related to this investigation for BRANDAO and CARVALHO-CENTEIO. It should be noted that Officers believe that there is an outstanding firearm that left 152 East Cottage Street after the shooting incident with BASS. A "no knock" entry will further minimize the possibility of danger to BRANDAO, CARVALHO-CENTEIO, BASS, innocent civilians, and Officers.

The same paragraph is included in warrant 2002SW0067 in which the same magistrate clerk denied the no-knock provision and the any persons present provision.

Paragraphs 56-59 "Conclusions" list the following, in relevant part, with the conclusion that the evidence is material and relevant to the ongoing investigation of the May 2, 2020 at 152 East Cottage Street, Dorchester:

> **(1)** 20 Humphreys Street, Apt. 3
> Clothing worn by Darius BASS (see Addendum D) during the shots fired incident at 152 E Cottage St, Dorchester, MA 02125, more specifically a grey hooded sweatshirt, black pants, multicolored white, black, and orange sneakers, firearms, firearms accessories, holsters, cleaning tools, ballistics including cartridges, cartridge cases, and bullets, cellular devices, and documents showing residency at 20 Humphreys Street #3, Dorchester, MA 02125.
> **(2)** Darius Bass
> Clothing worn by Darius BASS (see Addendum D) during the shots fired incident at 152 E Cottage St, Dorchester, MA 02125, more specifically a grey hooded sweatshirt, black pants, multicolored white, black, and orange sneakers, cellular devices, and documents showing residency at 20 Humphreys Street #3, Dorchester, MA 02125.
> **(3)** 2018 Toyota Camry
> Firearms, firearms accessories, holsters, cleaning tools, ballistics including cartridges, cartridge cases, and bullets, cellular devices, and documents showing residency at 20 Humphreys Street #3,

5

Dorchester, MA 02125.

The affidavit was signed under the pains and penalties of perjury by Donald Wightman and subscribed before the Clerk-Magistrate Kevin Lyler on May 11, 2020 for SW 2002SW0070.  The same acknowledgement was made for SW 2002SW0067.

**LAW**

"Under the Constitution, a warrant authorizing the search of property cannot issue except upon a showing of probable cause. See U.S. Const. amend. IV. Under this standard, such a warrant may issue only upon a showing that a crime has been committed and that evidence of that crime is likely to be found by a search of the designated property. See United States v. Clark, 685 F.3d 72, 78 (1st Cir. 2012)."   United States v. Adams, 971 F.3d 22, 27-28 (1st Cir. 2020).

The "warrant application must demonstrate probable cause to believe that (1) a crime has been committed-the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched-the so-called 'nexus' element." United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005) (citation omitted).

"Probable cause exists where information in the affidavit reveals "a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997) (internal quotation and citation omitted). "Probability is the touchstone" of this inquiry. Id. (internal quotation and citation omitted)." United States v. Baldyga, 233 F.3d 674, 683 (1st Cir., 2000).

The nexus requirement is satisfied if a person of "reasonable caution [has] reason to believe that evidence of a crime will be found at the place to be searched." United States v. Rodrigue, 560 F.3d 29, 33 (1st Cir. 2009) (internal quotation marks and citation omitted). United  States  v.  Rosenbeck Criminal No. 09-30042-DJC (D. Mass., 2011).

The totality of circumstances must create "a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Tanguay, 787 F.3d 44, 50 (1st Cir. 2015).  See also United States v. Coombs, 857 F.3d 439, 446 (1st Cir. 2017). "Probable cause means simply that the totality of the circumstances gives rise to a 'fair probability' that a search of the target premises will uncover evidence of a crime. United States v. Jordan, 999 F.2d 11, 13 (1st Cir.1993) (citations omitted).

We apply a "totality of the circumstances" standard in determining the sufficiency of an affidavit. Gates, 462 U.S. at 238, 103 S.Ct. at 2332. The affidavit is to be interpreted in a common-sense rather than a hypothetical or hypertechnical manner. See id.; United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965); United States v. Cochrane, 896 F.2d 635, 637 (1st Cir.), cert. denied, 496 U.S. 929, 110 S.Ct. 2627, 110 L.Ed.2d 647 (1990).

In the case at bar, one federal warrant and two state search warrants were granted.  One state warrant, 2002SW0070, was executed.

> A federal court reviewing the sufficiency of a warrant issued by a state court, for the purpose of determining whether the fruits of a resulting search are lawful and hence admissible in a federal prosecution, must determine whether the warrant was issued as a federal warrant or as a state warrant. If the warrant was issued under authority of Rule 41 as a federal warrant clearly it must comply with the requirements of the rule. If, however, the warrant was issued under authority of state law then every requirement of Rule 41 is not a sine qua non to federal court use of the fruits of a search predicated on the warrant, even though federal officials participated in its procuration or execution. The products of a search conducted under the authority of a validly issued state warrant are lawfully obtained for federal prosecutorial purposes if that warrant satisfies constitutional requirements and does not contravene any Rule-embodied policy designed to protect the integrity of the federal courts or to govern the conduct of federal officers. Cites omitted.

United States v. Mitro, 880 F.2d 1480, 1484-84 (1st Cir. 1989).

As this case involves a state warrant, we need only ask whether the warrant satisfied constitutional requirements and did not contravene "any Rule-embodied policy designed to protect

the integrity of the federal courts or to govern the conduct of federal officers." Id.

The defendant submits that in light of the totality of circumstances there is not "a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Tanguay, 787 F.3d 44, 50 (1st Cir. 2015).

### *No Knock Warrant*

The defendant submits that the use of a no knock warrant, absent probable cause, requires all the evidence obtained subsequent to the forced entry to be suppressed.

A man's home is his castle. Minnesota v. Carter, 525 U.S. 83, 94 (1998). The people's protection against unreasonable search and seizure in their houses was drawn from this English common-law maxim. Id.

It is well settled that police officers must "knock and announce" their presence and purpose before executing a search warrant. The rule, like the notion of the home as one's castle, arises from a long common-law tradition. The purposes of the knock and announce rule are threefold: to protect the privacy interests of individuals; to minimize the likelihood of property damage; and to reduce the possibility of violence after an unannounced entry. See Richards v. Wisconsin, 520 U.S. 385, 393 n. 5 (1997).

While a warrant does permit law enforcement, upon a showing a probable cause, to invade this normal zone of privacy, the knock and announcement requirement is carefully tailored to infringe upon this right no more than necessary. See Richards, 520 U.S. at 393 n. 5 (1997).

In this case, the clerk denied the no knock entry. The affiant then submits the same affidavit and search warrant to the same clerk. At this time, the clerk, with no new showing of probable cause, changed his position and allowed a no knock entry.

8

"Federal Constitution does not require state authorities, before they issue a "no-knock" warrant, to have probable cause to believe that entry without knocking is required. All that is required is that it be reasonable under the circumstances to allow an unannounced entry." U.S. v. Jewell, 60 F.3d 20, 23 (1st Cir. 1995).

The Court "must therefore determine whether the affidavit presented in support of the application for a 'no-knock' warrant reasonably described 'circumstances presenting a threat of physical violence.'..." U.S. v. Jewell, 60 F.3d 20, 23-24 (1st Cir. 1995).

"In order to justify entry without knocking on the basis of concern for officers' safety, the police must "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous." Richards, 520 U.S. at 394, 117 S.Ct. 1416. The Supreme Court in Richards imported the "reasonable suspicion" test from Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which requires that an officer "be able to point to specific and articulable facts," id. at 21, 88 S.Ct. 1868, and have "at least a minimal level of objective justification," Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). U.S. v. Sargent, 319 F.3d 4, 9 (1st Cir. 2003).

Notable factors allowing a no knock warrant, are a pit bull inside the home (See Jewell, supra) and eyewitness statements of firearms inside the house. (See U.S. v. Rigaud, 684 F.3d 169 (1st Cir. 2012).

In the case at bar, the affiant was aware 20 Humphreys Street, Apt. 3 was a family home. Included in paragraph 52, the affiant is aware that Mr. Bass' father resides in the residence. Additionally, the Toyota Camry owned by Bass' mother is registered to 20 Humphrey Street. See Paragraph 27.  Lastly probation had been inside the home of Darius Bass.  The affiant acknowledges that Bass was on active probation at the time of the writing of the affidavit.  See

9

paragraph 52.  Nothing was reported by probation and to the Boston PD that would allow the police to "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous." Richards, 520 U.S. at 394, 117 S.Ct. 1416.

The defendant submits that there was no risk to officer safety or anyone else.  The search was executed early in the morning when the sole occupant was asleep.   Furthermore, the officers who first entered were heavily-protected SWAT team members.

When the Boston PD breached the door of 20 Humphrey Street, the sole occupant inside the apartment was Deborah Hendrix, age 59, who the police put in handcuffs while they swept the apartment. After the police breached the front door with a battering ram, were present inside the home, the police proceeded to breach the rear door.

The defendant submits that the first determination by the Clerk that probable cause did not exist to allow a no knock warrant was correct.

### *Any Person Present*

In the case at bar, the defendant submits that the affiant provided no probable cause to believe that any person found in the home would or did violate the law.  As previously noted, in the first search warrant written for 20 Humphreys Street, the clerk did not find probable cause that search of any person present existed.  Again, without change to the affidavit, the second warrant presented to the same clerk resulted in allowing the search of any person present.

> When the search warrant was issued the authorities had no probable cause to believe that any person found in the tavern, aside from the bartender, would be violating the law. The complaint for the warrant did not allege that the tavern was frequented by persons illegally purchasing drugs or that the informant had ever seen a patron of the tavern purchase drugs from the bartender or any other person.
>
> And probable cause to search appellant was still absent when the police executed the warrant; upon entering the tavern, the police did not recognize appellant and had no reason to believe that he had committed, was committing, or was about to commit any offense. The police did possess a warrant based on probable cause to search the tavern where

10

appellant happened to be when the warrant was executed, but a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Sibron v. New York, 392 U.S. 40, 62-63, 88 S.Ct. 1889 1902, 20 L.Ed.2d 917. Although the warrant gave the officers authority to search the premises and the bartender, it gave them no authority to invade the constitutional protections possessed individually by the tavern's customers. Pp. 90-92.

The Fourth and Fourteenth Amendments will not be construed to permit evidence searches of persons who, at the commencement of the search, are on "compact" premises subject to a search warrant, even where the police have a "reasonable belief" that such persons "are connected with" drug trafficking and "may be concealing or carrying away the contraband." Cf. United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210. Pp. 94-96. 58 Ill.App.3d 57, 15 Ill.Dec. 541, 373 N.E.2d 1013, reversed and remanded.
Ybarra v. Illinois, 444 U.S. 85, 86 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).

In the instant case, no probable cause existed to search any person present.

## *Gang Activity*

The affiant identifies Darius Bass as one of "[t]hese individuals identified through video footage …. known to Detectives to be members of NOB/Wendover Street Gang."  Gang activity becomes the affiant's basis of past and present acts of firearm and gang related violence, including feuds, shootings and homicides.  See paragraphs 18, 20, 26, 31, 55.

Other than the affiant's statement that Bass, among others, is to be a member or NOB/Wendover Street Gang, there is no information provided by the affiant as to the reason that Bass is considered a gang member nor is any information provided as to the NOB/Wendover Street gang.

The manner and means in which the Boston Police have identified persons as gang members has been called into question.  It is known that the Boston Police developed the BRIC database.[4]  In the recent US Court of Appeals for the First Circuit decision, Diaz Ortiz v. Merrick

---

[4] The BRIC is a unit of the Boston Police Department that gathers and investigates information in an effort to reduce violence in Boston, and stores the data in a database that is accessible to federal law enforcement agencies (like the Department of Homeland Security) and local entitles like the Suffolk County Sheriff's Department and Boston Housing Authority. https://commonwealthmagazine.org/criminal-justice/boston-centers-gang-database-lists-3853-people/

11

Garland US Attorney General, the court found that the Boston gang database "does not contain 'reasonable, substantial, and probative evidence' of gang membership or association, and the government provided no other evidence to substantiate the inferences and conclusions drawn from the police reports via the BRIC point system….[the] "evidence was simply not "of a 'kind and quality' that a reasonable factfinder could find sufficient" to support labeling Diaz Ortiz a gang member ……" Ortiz v. Garland, No. 19-1620.

The defendant submits that to use the affiant's statements regarding Bass as a gang member is not sufficient and cannot substitute for actual evidence of criminal activity. See United States v. Schultz, 14 F.3d 1093, 1097 (6th Cir. 1994); United States v. Benevento, 836 F.2d 60, 71 (2nd Cir. 1987), cert. denied, 486 U.S. 1043 (1988) (agent's opinion "standing alone, might not be sufficient to establish a link" between a place to be searched and the alleged criminal activity).

The affiant's statements concerning Mr. Bass and gang membership are not sufficient and cannot substitute actual evidence of criminal activity. Id.

***Search Warrant Was Stale***

The defendant submits the search warrant was stale.  The alleged shooting being investigated occurred on May 2, 2020.  The search warrant did not issue until May 11, 2020.

"Information contained in an affidavit is stale if it established probable cause at some point in the past but does not support probable cause at the time of the warrant's issuance. Sgro v. United States, 287 U.S. 206, 210, 53 S.Ct. 138, 77 L.Ed. 260 (1932) ("[I]t is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.")." United States v. McLellan, 792 F.3d 200, 210 (1st Cir. 2015).

The defendant acknowledges that "[a]n allegation of staleness is evaluated not merely on how old the information is, but circumstances including the nature of the suspected crime, the character of the items to be seized, the habits of the suspect, and the nature of the premises to be searched."  United States v. Burgos-Montes, 786 F.3d 92, 107-108 (1st Cir. 2015).

The items the affiant seeks are those that would not remain in the place to be searched. Contesting the affiant's reliance that firearms are likely to remain in the familial home of Bass.

"It is well established that the temporal proximity or remoteness of the events observed has a bearing on the validity of a warrant. Rosencranz v. United States, 356 F.2d 310, 315-16 n. 3 (1st Cir. 1966). See also United States v. Steeves, 525 F.2d 33, 38 (8th Cir. 1975). But no hard and fast rule can be formulated as to what constitutes excessive remoteness, because each case must be judged in its circumstantial context. See Sgro v. United States, 287 U.S. 206, 210-11, 53 S.Ct. 138, 77 L.Ed. 260 (1932); United States v. Guinn, 454 F.2d 29, 36 (5th Cir.), cert. denied, 407 U.S. 911, 92 S.Ct. 2437, 32 L.Ed.2d 685 (1972); State v. Tella, 113 R.I. 303, 308, 321 A.2d 87, 90 (1974). Factors like the nature of the criminal activity under investigation and the nature of what is being sought have a bearing on where the line between stale and fresh information should be drawn in a particular case. United States v. Steeves, supra at 38; United States v. Johnson, 461 F.2d 285, 287 (10th Cir. 1972). U.S. v. Dauphinee, 538 F.2d 1, 5 (1st Cir. 1976)

So too the items sought in the case at bar should be considered in disposable and "lend themselves to rapid disposition".  Id.

### ***Training and Experience of Affiant Not a Substitute for Actual Evidence of Wrongdoing***

In the case at bar, the affiant appears to rely not solely on his training and experience, but also on that of others.

13

While a magistrate may consider an agent's experience and expertise as an "additional element" used to evaluate the sufficiency of the affidavit, it cannot substitute for actual evidence of criminal activity.  See <u>United States v. Schultz</u>, 14 F.3d 1093, 1097 (6th Cir. 1994); <u>United States v. Benevento</u>, 836 F.2d 60, 71 (2nd Cir. 1987), *cert. denied*, 486 U.S. 1043 (1988) (agent's opinion "standing alone, might not be sufficient to establish a link" between a place to be searched and the alleged criminal activity).

Permitting a search warrant based solely upon the self-avowed "expertise" of a law-enforcement agent, without other sufficient facts that support a finding of probable cause "would be an open invitation to vague warrants authorizing virtually automatic searches […]" <u>United States v. Rosario</u>, 918 F.Supp. 524, 531 (D. R.I. 1996) (citing *Schultz*, 14 F.3d at 1098).

The defendant submits that the training and experience alleged by the affiant did not provide sufficient probable cause of wrongdoing.  Taken in conjunction with the other detectives making identifications of the defendant alleged to be on video and the argument, supra of gang members, the defendant submits sufficient probable cause of wrongdoing is not met.

### ***Basement Not Part of Curtilage that Darius Bass has Access To***

In a modern urban multifamily apartment house, the area within the 'curtilage' is necessarily much more limited than in the case of a rural dwelling subject to one owner's control. <u>Care v. United States</u>, 231 F.2d 22, 25 (10th Cir.), cert. den. 351 U.S. 932, 76 S.Ct. 788, 100 L.Ed. 1461; <u>McDowell v. United States</u>, 383 F.2d 599, 603 (8th Cir.). In such an apartment house, a tenant's 'dwelling' cannot reasonably be said to extend beyond his own apartment and perhaps any separate areas subject to his exclusive control.' <u>U.S. v. Cruz Pagan</u>, 537 F.2d 554, 558 (1st Cir. 1976)

"Curtilage is treated as an extension of the home, both for extending Fourth Amendment

protections and for defining the scope of search warrants." The United States Supreme Court has set out four factors to be considered when deciding whether a particular area is within the curtilage of a given home: (1) the proximity of the area to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observations by people passing by.  U.S. v. Dunn, 480 U.S. 294, 301 (1987)).

The police searched the basement of the three family home.  The warrant permitted police to search "any storage areas, basement or commons areas that Darius Bass has access to." By searching an area in which there is not determination that Bass had access to, the police impermissibly conducted a warrantless search. See Opalenik v. LaBrie, 945 F. Supp. 2d 168, 184-185 (D. Mass. 2013)

Therefore, all evidence obtained from the basement must be suppressed.

### *Excise Illegally Obtained Evidence*

The defendant submits that if the evidence obtained by use of the pole camera videos were excised from the affidavit, no probable cause would exist.   The defendant incorporates by reference all arguments contained in the motion to suppress the warrantless search regarding pole camera videos of 152 East Cottage Street, Dorchester.

### *Fruit of the Poisonous Tree*

Weeks v. United States, 232 U.S. 383 (1914) held evidence seized during an unlawful search cannot constitute proof against the victim the search.

> The essence of a provision forbidding the acquisition of evidence
> in a certain way is that not merely evidence so acquired shall not
> be used before the Court but that it shall not be used at all.  Of course
> this does not mean that the facts thus obtained become sacred and
> inaccessible.  If knowledge of them is gained from an independent
> source they may be proved like any others, but the knowledge gained

15

by the Government's own wrong cannot be used by it the way proposed. Silverthorne Lumber Co. v.. United States, 251 U.S. 385, 391 (1920).

In Wong Sun v. United States, 371 US 471, 486 (1963) the exclusionary rule was applied to indirect as well as direct products of violations of constitutional rights.

So too in the case at bar, no attenuation cannot dissipate the taint.

### *No Good Faith Exception Applies*

In reviewing cases raising the issue of the good faith exception or lack thereof, the United States Court of Appeals have found "that the district court's hearing of pertinent testimony before applying the good faith exception strikes the right balance between deference to and oversight of the issuing magistrate's judgment." United States v. Robinson, 359 F.3d 66, 70 (1st Cir. 2004). In Robinson, the Court stated that it had the "benefit of an evidentiary hearing …. to determine whether the Leon exception applied. Since factors found outside the four corners of a warrant affidavit may support use of the exclusionary rule despite the issuance of a procedurally-compliant warrant." Id at 69.

In United States v. Leon, 468 U.S. 897, 903-904 (1984), the lower Court held an evidentiary hearing to rule on the issue of suppression where the testimony of the officer was necessary to make a determination of whether the evidence seized was in reasonable good faith.

> This case presents the question whether the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. To resolve this question, we must consider once again the tension between the sometimes competing goals of, on the one hand, deterring official misconduct and removing inducements to unreasonable invasions of privacy and, on the other, establishing procedures under which criminal defendants are "acquitted or convicted on the basis of all the evidence which exposes the truth." Alderman v. United States, 394 U.S. 165, 175, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969). United States v. Leon, 468 U.S.

16

897, 900-901 (1984)

In the case at bar, the warrant is insufficient to support probable cause and the defendant asserts that the good faith exception does not exist. In order to determine if the good faith exception exists, the defendant submits that a hearing is necessary to determine whether the law enforcement officer relied in good faith in the warrant. "The usual remedy for seizures made without probable cause is to exclude the evidence wrongfully seized in order to deter future violations of the Fourth Amendment. This exclusionary rule does not obtain, however, where an objectively reasonable law enforcement officer relied in good faith on a defective warrant because suppression in that instance would serve no deterrent purpose." United States v. Brunette, 256 F.3d 14, 19 (1st Cir. 2001).

"The government has the burden of showing that the officers acted in good faith, and relied on a warrant that was facially valid …." United States v. Echevarría-Ríos, 746 F.3d 39, 41 (1st Cir. 2014).  See also United States v. Diehl, 276 F.3d 32, 42 (1st Cir.2002) (explaining if the government invokes the good faith exception to the Fourth Amendment's exclusionary rule, it bears the burden of showing that the officers acted in good faith.

Courts have discretion to proceed directly to the good faith issue without first addressing probable cause issue.  Leon, supra at 925.

In the case at bar, the defendant seeks an evidentiary hearing to address the assertion that the warrant lacked probable cause and the good faith exception does not apply.  The defendant submits that the Government bears the burden to show the officers acted in good faith.

CONCLUSION

For the foregoing reasons, the defendant prays this Honorable Court will suppress the evidence.

17

        Respectfully submitted,
        DARIUS BASS
        By his attorney,

        */s/ Joan M. Fund*
        Joan M. Fund, Esq.
        Fund & FitzGerald
        245 First Street, Suite 1800
        Cambridge, MA 02142
        (508) 878 6830
        (617) 945 9693
        joanmfund@gmail.com
        BBO#181430

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

        /s/ Joan M. Fund
        Joan M. Fund, Esquire

Date: February 3, 2022