UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES | ) ) ) | |
| v. | ) ) | Criminal No. 20-10197-10-LTS |
| DARIUS BASS. | ) ) ) | |

ORDER ON MOTIONS TO SUPPRESS (DOC. NOS. 360, 363, 366)

April 27, 2022

SOROKIN, J.

Darius Bass has filed three motions to suppress evidence he anticipates the government might adduce at trial. One challenges evidence seized from Bass's home when a search warrant for that location was executed by Boston police in May 2020. Doc. No. 360.[1] Another addresses statements Bass made during an interaction with police in Randolph, Massachusetts, in January 2017. Doc. No. 363. The third concerns evidence seized during the search of a vehicle that resulted from the same January 2017 encounter. Doc. No. 366. The government has responded to each motion. Doc. Nos. 401, 404, 405. For the reasons explained below, the Court finds no hearing is warranted, and Bass's motions are DENIED.

I. **JANUARY 2017 EVENTS**

   A. Background[2]

On the evening of January 1, 2017, police responded to a shooting on Howe Circle in Randolph, a cul-de-sac that borders the local high school's athletic fields. No suspects were

---

[1] Citations to "Doc. No. __ at __" reference items appearing on the court's electronic docketing system, and pincites are to the page numbers in the ECF header.
[2] The Court recounts the facts as the parties describe them, and with reference to the affidavits supporting relevant warrant applications. See Doc. No. 364 at 1-7; Doc. No. 401 at 2-5.

identified, but police interviewed residents in the area and recovered physical evidence from the scene. The next morning, police responded to a civilian report of two men acting suspiciously near the high school athletic field. The civilian who made the report was known to police. He said the men were wearing dark clothing, that one man had jumped over a fence at the field, and that the men had arrived in a Chevy Malibu with a license plate number the civilian also provided. Officers responded to the field, which was within walking distance of the police station. The officers were aware of the shooting that had occurred the previous night and the evidence found in the area.

    Upon their arrival, two officers approached Bass, who was standing near a fence separating the field from the backyards of the homes on Howe Circle. The officers spoke with Bass, who made various statements in response to questions about who he was, how he had arrived at the field, and what he was doing there. Other officers questioned a second man, Marcos Silveira,[3] who had the keys to the Malibu and was seen exiting the backyard of the house where shell casings and a cell phone had been found after the shooting. Bass denied knowing Silveira and denied any connection to the Malibu. The parties dispute the number of officers present during Bass's encounter with police as well as whether Bass was handcuffed for any portion of the interaction.

    Officers on the scene looked inside the Malibu and could see one iPhone and one empty phone case in the center console, as well as Silveira's driver's license on the driver's seat. The empty phone case was noted because the phone recovered at the scene of the shooting had not been in a protective case. Bass and Silveira were allowed to leave, but the officers impounded the Malibu. The next day, a warrant issued authorizing a search of the Malibu, Doc. No. 401-4,

---

[3] Silveira is not charged here.

which led to the seizure of the items the officers had observed along with two loaded firearms. Detectives then obtained state and federal warrants authorizing a search of the iPhone recovered from the Malibu. That phone belonged to Bass, and it contained GPS information and online searches appearing to link Bass with the shooting. See Doc. No. 366 at 12.

### B. Statements

In one of his pending motions, Bass asks the Court to suppress the statements he made to police during the above-described encounter. Doc. No. 366 at 7-12. The Court need not linger over Bass's challenge, as the government has represented that it "does not presently intend to use any [of Bass's challenged] statements at trial." Doc. No. 404. Given the government's position, Bass's motion to suppress statements (Doc. No. 363) is DENIED AS MOOT. This ruling is without prejudice to Bass reviving his challenge in the event the government changes its mind about the relevant statements.

### C. Car Search

The second of Bass's motions arising from the January 2017 events challenges the searches of the Malibu and the iPhone recovered therein and seeks an order precluding the government from offering at trial any evidence seized as a result of those searches. Even if the Court accepts Bass's position on the disputed fact questions, his motion fails as a matter of law.[4]

First, insofar as Bass contests the lawfulness of the seizure and search of the Malibu, he cannot invoke the Fourth Amendment's protection against unreasonable searches with respect to that location. It is undisputed that Bass was neither the owner nor the operator of the Malibu.

---

[4] There is no "presumptive right to an evidentiary hearing on a motion to suppress." United States v. D'Andrea, 648 F.3d 1, 5 (1st Cir. 2011). To establish entitlement to such a hearing, a "defendant must show that there are factual disputes which, if resolved in his favor, would entitle him to" suppression. United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996).

Though he had been a passenger in the Malibu at some point prior to his encounter with police, he had admittedly exited the vehicle before officers arrived at the athletic field—and well before they impounded the Malibu, obtained a warrant, and conducted the search. Well-settled law dictates that Bass had no reasonable expectation of privacy in the Malibu in these circumstances and, thus, "lacks standing to challenge the search" thereof.[5] United States v. Symonevich, 688 F.3d 12, 18-21 (1st Cir. 2012).

This is so irrespective of whether Bass abandoned his phone by leaving it in plain view in the open center console of some else's vehicle when he exited the Malibu. Similarly, Bass would not gain standing were the Court to find that police crossed constitutional lines when they stopped, frisked, and questioned him at the athletic field (and, thus, the Court need not reach those issues). The record establishes beyond dispute that the identification and seizure of the Malibu occurred, or would have occurred, based on information available to the officers from sources other than Bass. See Doc. No. 364 at 2-5 (describing citizen's identification of the car including by its license plate number, officers' observation of an empty phone case inside the Malibu and the perceived link between that case and the phone apparently dropped by the fleeing shooter the night before, and Silveira's possession of the keys to the Malibu and presence in the backyard of the property where the phone had been recovered);[6] cf. United States v. Flores, 888

---

[5] To the extent Bass challenges the warrant police obtained before searching the car, including whether the warrant permitted the seizure of the phone, such challenges are likewise foreclosed by his lack of standing—and would fail in any event for reasons identified by the government. See Doc. No. 401 at 17-19 (explaining that the law would have empowered the officers to conduct a warrantless search of the Malibu on the spot, that the independent source doctrine would separately justify admission of the evidence recovered from the Malibu, and that the vehicle exception and the plain view doctrine justified seizure of the phone).

[6] Just as Bass lacks standing to challenge the seizure and search of the Malibu, he cannot assert constitutional challenges to the interaction between police and Silveira or any evidence discovered as a result of that interaction.

F.3d 537, 545-46 (1st Cir. 2018) (explaining independent source doctrine prevents suppression where evidence or information would have been ascertained even without the alleged error or misconduct by police).

Second, beyond his arguments regarding the seizure and search of the Malibu, Bass advances no meaningful challenges to the subsequent search of the iPhone.[7] That search occurred pursuant to a warrant, the content of which Bass does not address in any detail. See Doc. No. 366 at 8-14 (summarizing the affidavit in general terms, reciting settled principles governing probable cause and warrant applications, observing that Fourth Amendment protections extend to electronic communications, and stating in conclusory fashion that "the search warrant affidavit did not contain facts sufficient to meet the requisite probable cause standard"). Bass makes no developed argument about what was lacking in the affidavit supporting the warrant application, identifies no analogous case in which a warrant application was found inadequate, and does not suggest (let alone demonstrate) that the warrant contained materially false or misleading statements or omissions warranting further hearing or review by this Court.[8]

---

[7] Again, this is so without the need to resolve whether Bass abandoned the phone by leaving it in the Malibu and then disclaiming any connection to that vehicle.

[8] The Court has read the relevant warrant applications, which the government attached to its memorandum. Doc. Nos. 401-5, 401-6. The affidavits appear to reasonably describe the affiant's training, the January 1, 2017 shooting and evidence recovered at the scene, the citizen report describing the Malibu and the men who arrived in it, the reasons officers believed the empty phone case in the Malibu combined with Silveira's presence in the yard where the phone had been recovered suggested both a connection between the two men and the shooting (a crime) and a nexus between the crime and the places to be searched (the car and the phone therein), and the connection observed between chat notifications showing on the lock screens of both Bass's phone and the phone recovered from the scene of the shooting. See generally Doc. No. 401-6. These facts appear sufficient to support a finding of probable cause even if the Court were to disregard the affiant's description of the police encounter with Bass and the statements he made. In addition, the law accords "significant deference" to the "initial evaluation" made by the neutral magistrate—state or federal—who reviewed and approved the warrant application,

Finally, even if Bass had standing to challenge the seizure or search of the Malibu and/or had articulated a meritorious challenge to the search of his phone, he has not advanced any reason that the good-faith exception to the exclusionary rule would not apply here. See Doc. No. 366 at 15 (noting the existence of the good-faith exception, then stating that a hearing is necessary because "the Government bears the burden to show the officers acted in good faith"). A defendant does not establish the need for an evidentiary hearing simply by mentioning United States v. Leon, 468 U.S. 897 (1984). Here, the record establishes that an officer searching the Malibu reasonably could have believed he was authorized to seize the phone he found inside it, and that the affidavit at issue was not so facially deficient as to render unreasonable an officer's belief in its validity. Bass has identified no material facts that were intentionally or recklessly omitted from the application. Thus, no hearing is warranted in order to assess whether the officers acted in good faith. See United States v. Pimentel, 26 F.4th 86, 90-96 (1st Cir. 2022) (discussing good-faith exception); United States v. Belton, 414 F. Supp. 2d 101, 106-07 (D.N.H. 2006) (same).

Accordingly, Bass's motion to suppress evidence derived from the searches of the Malibu and the iPhone recovered therefrom (Doc. No. 366) is DENIED.

II. **MAY 2020 SEARCH**

A. Background[9]

On May 2, 2020, police were called to a location in Dorchester after shots were fired in the area. The ensuing investigation yielded ballistics evidence suggesting two different guns had

---

United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005), further cementing the probable cause determination.
[9] As above, the Court recounts the facts as the parties describe them, with reference to the affidavits supporting the warrant applications. See Doc. No. 361 at 2-6; Doc. No. 405 at 2-5.

6

been fired, but only one gun was recovered at the scene. Police also collected and watched video footage of the area at the time of the shooting, which showed Bass and others (including two co-defendants in this case) present at the time of the shooting. According to police, the video showed Bass dropping an object that appeared to be a firearm while fleeing from the shooting, then retrieving that object from a co-defendant who had picked it up. Bass left holding the object, then drove from the location of the shooting to 20 Humphreys Street in Dorchester. He was accompanied on the drive by another man who had also been present for the shooting and was also seen in video footage handling a firearm.[10]

The car Bass drove away from the scene was registered to his mother at the Humphreys Street address, and Bass's driver's license and criminal record confirmed that he identified 20 Humphreys Street, Apartment 3, as his home address. In the wake of the shooting, investigators prepared applications for both state and federal warrants authorizing a search of Bass's home. Those warrants were issued on May 11, 2020, and officers executed the state warrant that permitted a no-knock entry the following morning.

The warrant authorized officers to search Apartment 3 in the "three story multi-family residence" at 20 Humphreys Street, as well as "[a]ny storage areas, basement, or common areas" to which Bass had "access." Doc. No. 405-1 at 2. It permitted officers to search for and seize items including a black firearm, firearm accessories and ammunition, cell phones, and certain clothing (described in the warrant) which Bass had worn during the May 2 shooting. Id. The warrant application was supported by an affidavit describing the affiant's training and

---

[10] That person was not indicted with Bass, but he has separately pleaded guilty and been sentenced by another session of this Court for his participation in a racketeering conspiracy arising from his involvement in the same street gang that is the subject of the racketeering conspiracy charged in this case. See United States v. Carvalho-Centeio, No. 21-cr-10062-WGY, ECF Nos. 163, 167, 170, 180.

experience, the investigation into the May 2 incident, the video evidence collected by investigators, location information obtained from a state probation electronic monitoring system showing that the passenger seen in Bass's car had travelled directly from the scene of the shooting to Bass's home, and the basis for believing evidence linked to the shooting including cell phones, clothing, and a firearm would be located in Bass's residence.  Id. at 4-22.  The affiant also explained the basis for his belief that a no-knock entry was warranted in the circumstances.  Id. at 22.  Attached to the affidavit were still images from video surveillance showing Bass and the other targets of the warrant—the men seen together during and after the shooting—in the clothing they were wearing on May 2.  Id. at 27-30.

Bass was not present when the warrant was executed.  After using force to breach both the front and rear doors to the apartment, officers recovered: personal papers and bank cards in Bass's name, clothing consistent with the items described in the warrant, a holster, and ammunition in one bedroom; Bass's driver's license in another bedroom; and two guns with ammunition in the basement.

### B. Analysis

In the memorandum supporting his motion, Bass advances a series of challenges to the search of his home, none of which merits suppression.  The Court will address each in turn.

First, Bass argues that the circumstances described in the affidavit did not justify issuing a no-knock warrant.  Doc. No. 361 at 8-10.  Even if Bass is correct, "suppression is not an available remedy."  United States v. Garcia-Hernandez, 659 F.3d 108, 111-12 (1st Cir. 2011); accord United States v. Rigaud, 684 F.3d 169, 176 (1st Cir. 2012).[11]

---

[11] Bass also complains that the affiant presented serial applications to the state-court clerk-magistrate, with only the second resulting in the approval of a no-knock warrant.  Doc. No. 361 at 1, 8.  The government says the second application contained additional facts that justified

Second, Bass urges that the affidavit failed to establish probable cause sufficient to allow the search of "any person present" in the home when the warrant was executed. Doc. No. 361 at 10-11. However, as the government points out, Doc. No. 405 at 1 n.1, nothing before the Court suggests the officers executing the warrant recovered any evidence as a result of searching anyone at Bass's home. Bass concedes he was not there when the officers arrived, and he does not contend that anything was recovered from his mother (the only person he says was present at the time). Doc. No. 361 at 1-2. Thus, this challenge is moot.

Third, Bass faults the affiant for providing "no information" explaining why "Bass is considered a gang member," and argues that his unsupported statement in that regard "cannot substitute [for] actual evidence of criminal activity." Doc. No. 361 at 11-12. Here, however, the affidavit includes detailed information about a particular instance of criminal activity, including descriptions of video footage showing Bass was present at the scene of a shooting and fled from the scene holding what appeared to be a firearm (for which he had no license). Even if the affiant's references to gang affiliation were excised from the application, plenty would remain in the affidavit linking Bass to specific criminal activity and establishing probable cause.

Fourth, Bass "submits the search warrant was stale," as it was obtained nine days after the shooting under investigation. Doc. No. 361 at 12-13. But he relies on cases in which even more time elapsed without findings of staleness. See, e.g., United States v. McLellan, 792 F.3d 200, 211 (1st Cir. 2015) ("[W]e do not believe this two-plus-month delay in applying for the warrant rendered the information in the affidavit stale."). In addition, he provides no support for his suggestion that the items sought here—clothing, identifying documents, cellular devices, and

---

permitting entry without knocking. Doc. No. 405 at 1 n.2. The Court need not delve into this issue, as suppression would not be appropriate on this basis in any event.

9

firearms—are not "likely to remain in the familial home of Bass," nor does he seriously contest the affiant's articulated reasons for reaching the opposite conclusion.  Compare Doc. No. 361 at 13, with Doc. No. 405-1 at 17-18 (citing experience supporting common-sense opinion that "clothing is a commodity that people tend to keep for long periods of time and . . . store . . . in their place of residence," and identifying reasons "most people store their firearms in their homes or vehicles and generally keep them for a long period of time").  In these circumstances, the nine-day period between the shooting and the warrant application does not justify invalidation of the warrant based on staleness.

Fifth, Bass suggests the affiant has relied only on experience and expertise of himself and other officers, and not on any "actual evidence of criminal activity."  Doc. No. 361 at 13-14.  As the Court has already explained, the affidavit describes a shooting and the apparent possession of firearms by individuals without licenses for such possession—"actual evidence of criminal activity," regardless of the motivation for the shooting.  Though the affidavit also includes references to the training and experience of the investigators, it does so appropriately and as to subjects upon which a magistrate reasonably could rely on such information in assessing the probable cause showing.  See United States v. Floyd, 740 F.3d 22, 35 (1st Cir. 2014).

Sixth, characterizing his home as "a modern urban multifamily apartment house," Bass urges the Court to suppress the evidence found in the basement because "there is not [a] determination that Bass had access to" it.[12]  Doc. No. 361 at 14-15.  The problem with this argument is that it leads inescapably to a "Catch-22" identified by the government.  Doc. No.

---

[12] The Court notes that Bass also calls the house his "familial home," Doc. No. 361 at 13, and the government cites information suggesting Bass's "family owned the entire building," Doc. No. 405 at 4.  The Court need not resolve Bass's relationship with the entire building, versus with the apartment identified as his residence, as it does not alter the suppression analysis for reasons explained above.

405 at 7.  If Bass lacked control over or access to the basement, then he cannot have had a reasonable expectation of privacy in that area and, thus, lacks standing to assert a challenge to the search thereof.  If, on the other hand, Bass did have access to the basement, then the warrant expressly permitted the officers to search it, as Bass himself acknowledges.  Doc. No. 361 at 15.  In either case, suppression of the evidence found in the basement is unwarranted.

Seventh, Bass briefly suggests that the video footage described in the affidavit was obtained illegally, "incorporat[ing] by reference" a separate motion challenging "pole camera videos" of the location where the shooting occurred.  Doc. No. 361 at 15.  No such motion has been filed—by Bass, or by any other defendant.  Accordingly, this undeveloped argument, incorporating a motion never made, merits no further consideration.[13]

Eighth, Bass correctly recites the law allowing for suppression of "indirect as well as direct products of violations of constitutional rights," as fruits of a poisonous tree.  Doc. No. 361 at 15-16.  But there are no such fruits to suppress, as Bass has not established any violations of his constitutional rights.

Finally, Bass again describes the good-faith exception to the exclusionary rule.  Doc. No. 361 at 16-17.  He has failed to identify any constitutional deficiencies in the May 2020 warrant or the search conducted pursuant thereto, he has not identified any reason to think the affiant omitted material facts from the application for that warrant, and he has not explained why the officers executing the warrant could not reasonably have relied on it to conduct the search as

---

[13] The viability of a constitutional challenge to pole-camera surveillance of the exterior of a defendant's own home is an open question in the First Circuit.  See United States v. Moore-Bush, 963 F.3d 29 (1st Cir. 2020), vacated and reh'g en banc granted, 982 F.3d 50 (1st Cir. 2020).  Regardless how that question is resolved, however, Bass has identified no authority for the proposition that he had a reasonable expectation of privacy sufficient to confer standing on him to challenge evidence gathered via a pole camera aimed at someone else's home.

they did.  Based on the Court's own review of the warrant and supporting affidavit, the Court identifies no facial deficiencies.  Thus, no hearing is warranted to further explore this issue.

Accordingly, Bass's motion to suppress evidence derived from the search of his home in May 2020 (Doc. No. 360) is DENIED.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge